Good morning everyone. We're here today for oral arguments. We are going to begin with appeal numbers 22-2370 and 22-2413. Motorola Solutions, Inc. at all versus Hytera Communications Corporation Limited and we'll begin with oral argument. Mr. Clarn from you. Thank you. Good morning your honors. May it please the court. I'd like to start with the issue of extraterritorial sales with the court's indulgence. The district court discords 272 million dollars worth of Hytera's profits. That's 28 million in sales or in profits from sales from within the U.S. and 244 million in profits from sales from outside the U.S. Mr. Clarn, was that broken down, were the domestic sales broken down between the district and those covered by the trade secret statute? So there was about a hundred and thirty, there was a hundred and thirty-six million under the copyright and a hundred and thirty-six million under... I know. My question is whether the 28 million in domestic sales you refer to, whether the evidence breaks that down? Yes, your honor. It does. It's roughly 14 and 14. Okay. Where do you, can you tell us where to find the exact numbers? It is in docket 1100, Judge Norgal's opinion. I can provide a pin site. Okay, thanks. Is that disputed or is that, is that something he found? That is not disputed. It is something Judge Norgal found. It's in his docket 1100 but it was not disputed. Okay, I can ask Motorola but I thought there was some dispute over that but go ahead. I don't think there's any dispute over what's U.S. sales and what's foreign sales in both the copyright period and the DTSA period. So we're all familiar with the presumption against extraterritoriality. The legal analysis under the Copyright Act and the Defend Trade Secret Act is a little bit different, although quite similar. But what's common ground here is that in order for Motorola to recover High Terra's profits from extraterritorial sales, there must be an act within the United States that led to those sales. And here there's not evidence of such an act. What about the District Court's finding that the download originated in the United States? The District Court made a specific factual finding on that that we would have to find clearly erroneous if you're disputing that finding, which I think you are, as well as the legal implications of it. Your Honor, the District Court did not make a finding that the download originated in the United States. That's from a line in Motorola's red brief and it's incorrect. The word downloaded is actually outside the quotes. What the District Court actually found is that there's a main server in Illinois and there are mirrored remote servers outside of Illinois, including in Penang, Malaysia, where the employees downloaded these documents. And all that Judge Norgel found is that the documents and code are accessible from these servers, and he says including the server in Schaumburg, Illinois. So there's no evidence in this case and there's no finding in this case about where the code was downloaded from or where the documents was downloaded. Well, Motorola produced an expert that gave an opinion about these downloads and that the source code would have been downloaded from the United States. That is not Motorola's expert's opinion, Your Honor. So if we look at SA 70, actually the relevant testimony is SA 72 through SA 75. I'd actually direct the court to the bottom of SA 74. The question is, starting at line 23, you have no idea what server that download came from, do you? And the answer is, I don't know which particular cache it would have come from, and by cache he's referring to but it would have reflected material that is in Illinois because it would have been a mirrored site that he took it from, if not directly from Illinois. And so no, the next question is, so the answer to my question is, no, Mr. Klorn, I don't know where it came from. And the answer is, if you're asking me which particular cache or server he connected to to obtain it, no, I don't know that. So there's, I know there's, I was concerned that there would be some confusion about this, and so I'd like to direct the court to, and this is, I apologize, this is not in the appendix, it's in the trial transcript at page 5294. We have copies... Before you do that, Dr. Wicker, who was a telecommunications expert, testified before the jury that the source code came from the ClearCase system in Illinois. Professor Wicker did state in his direct a generic statement that the code came from the ClearCase system, which is in Illinois. But on cross examination, and then later on his redirect, what he explained is that the main servers are in Illinois, but there are remote servers in Malaysia, Chengdu, China, as well as India. And that Motorola made a decision to make copies of the code and the documents for the DMR technology and to place those copies in Malaysia on servers, in Chengdu on servers. Professor Wicker also admitted that the employees, the engineers in Penang, are connected directly to the Penang Malaysia servers, and Professor Wicker admitted that he does not know, and there is no evidence, which servers the downloads came from. In particular, Professor Wicker admitted that there is, and this is on SA-77, you're right, there's no evidence of the actual downloads from ClearCase. I'd also direct the court to SA-9, where Scott Shepard, Motorola's head of IT security, testified that the ClearCase system does not track downloads at all. And so there's no evidence in the case anywhere of what server was accessed in order to make the downloads. I have one more question and then I'll let you move along. So I'm looking at a reading from the District Court's findings, effect, and conclusions of law. Is it your position that the District Court's statement or finding that the main ClearCase server is in Illinois and that server is mirrored in other locations, the ClearCase servers reflected material that is in Illinois, and anything that happens on those other ClearCase sites goes to Illinois? The District Court made that finding. Is it your position that that's not sufficient for a finding that this happens in Illinois? Correct. We have to be real clear about what the District Court is saying. So the District Court is saying, I believe Your Honor was reading from paragraph 51 on... Page 25. I'm sorry? I think it was page 25. Go ahead. You can go ahead and respond. So paragraph 51, A-84, that's one finding. The HITERA stole the misappropriated trade secrets from Motorola's Compass System and ClearCase system, respectively, servers for which are located in the United States and are accessible at Motorola's facilities, including its Schomburg office. So I think that language is pretty clear that all the court's saying is that the code is accessible from Schomburg, but the code is also accessible from, as Motorola's expert Professor Wicker testified, the code is also accessible from Penang, Malaysia servers, as well as Chengdu servers. And on page 25, Your Honor's correct, there's a finding, paragraph 93. It says the copyrighted source code that HITERA copied was taken from Motorola's ClearCase system and brought over to HITERA. Dr. Steven Wicker, Motorola's technical expert, explained that the main ClearCase servers in Illinois, and that server is mirrored in other locations, again, which includes Penang, Malaysia, where the employees took the code from. It says, as a result, the other ClearCase servers reflected material that's in Illinois, and that's important. And I want to point out in just a second where Dr. Wicker explains what mirroring means, that the same information is in Penang as is in Illinois. And then the court goes on with its finding and says, and anything that is not a finding, that when there is a download from a remote server, like in Penang, that anything happens in Illinois. The evidence in the case is very clear on that. You were referencing trial transcripts on page 5294. Yes, Your Honor. What does that have in relation to? So there, Professor Wicker is asked to explain, so there was this discussion that I read earlier on his cross, where he admitted that he doesn't know which server the code came from. And then on Redirect, his counsel asked him to explain mirroring, and this is what he said. He says, so when you're creating a large distributed system, a system that's going to be used all around the world, and you want to be able to provide people with information, but you also want to have control of that information, what you're going to do is to have one main server and then a lot of local servers that reflect the information in the main server. That's what's called mirroring. So you have a main server in Illinois and then have a server, for example, in Penang that has the same information. The Penang server mirrors what's in Illinois, but if you make changes in Penang, it causes changes in Illinois and vice versa, so they continue to look like each other. You wouldn't want a system in which everybody was accessing one server wherever that was. You're talking about amending data in the server as opposed to just downloading it and copying it, which is what your engineers do. Exactly, Your Honor, exactly. That is also confirmed on separate appendix 9 through 11, where Scott Shepard, Motorola's IT security expert, explains that the only thing that's going on in Epic's system is that the patent system, the purpose of that system, doesn't track downloads. Mr. Klorn, can we talk about punitive damages? Yes, Your Honor. Do you think our opinion in Epic's systems can be reconciled with the constitutionality of the Sherman Act, RICO, and exemplary damages under the patent system? Yes, Your Honor, absolutely. So I think really what's going on in Epic's systems, mindful that judges on this panel wrote that opinion and worked on that opinion, what I think's really going on there is you've got an award, just like we do here, of unjust enrichment. So my mind tends to go to the second gore factor, and that is not actual loss to the plaintiff. And so there's a 2x multiplier cap on that award of unjust enrichment, and when it's as high as, in Epic's systems, 140 million, or here, 136 million, then we're starting to reach the limits of constitutional due process. So what about the Sherman Act? What about RICO? So in Sherman Act and RICO, I think we're dealing with, not necessarily just, you know, we can be dealing with actual loss from the plaintiff. So sometimes in criminal law, fines may be authorized in terms of multiples of the defendant's gain. Correct. Is that unconstitutional? No, it is not unconstitutional. Why not? How's it different? In white-collar crimes, only money. So we're not taking the position that a 2x cap is unconstitutional in all circumstances. And in fact, in the... Only financial loss. And a financial gain for the defendant. So it's also the Economic Espionage Act, the Criminal Trade Secret Statute, the fine is 5 million up to 3 times the value to the defendant. So the benefit to the defendant. That's not necessarily unconstitutional. It could be if the value to the defendant, you know, it's up to 3x. So it could be if the value to the defendant was very high and that resulted in a very high fine. It doesn't necessarily have to be. So your answer leads into one of my other questions that I had for this morning. You've argued that the trade secret damages were not properly apportioned. That your profits were not properly apportioned. Why should we not treat that arguable error as harmless in view of the defendant's avoided research and development costs, which actually were greater than the awarded loss, profits rather, on the unjust enrichment theory. That would also seem to address your response regarding the punitive damages. Your Honor, I notice I'm into my rebuttal time. I'll answer the question. Please do. I've got some more. There was no finding of lost profits from Judge Norgal. There was no award of lost profits from the jury. So Motorola, at trial, in closing, told the jury, if you award Motorola all of the unjust enrichment that it's entitled to, then you don't have to worry about actual loss or lost profits. That's R, record 931, at transcript page 5706, lines 19 through 24. Right, but that was treated as advisory. So let's talk about Judge Norgal's findings. And Judge Norgal's findings are at A72, paragraphs 9 and 10. So paragraph 9 addresses Judge Norgal's finding on avoided R&D, and he points out that that's 73 million, and Judge Norgal did make actual findings on avoided R&D, ultimately holding that it's duplicative of profit disgorgement. Paragraph 10, all Judge Norgal does, again at A72, is to point out that Motorola argued for 86 million of lost profits. Judge Norgal doesn't make any finding. That's not the way that reads. Looks like a finding to me. Judge Norgal, so... Quote, the 209.4 million dollars exceeds Motorola's 86.2 million in Motorola's lost profits due to high terrorist trade secret misappropriation under the DTSA. Judge, right, all Judge Norgal is doing is pointing out that Motorola argued, in paragraph 10, it says exceeds Motorola's 86.2 million... I don't see the word argue there. So there... Judge Norgal is sitting in equity. So Judge Norgal doesn't have the ability to award lost profits. Lost profits is a legal claim that can only be awarded by the jury, and Motorola asked the jury not to award lost profits. The reason that Judge Norgal declared the jury verdict advisory, as Judge Norgal explains in docket 1099 and docket 1100, is because Judge Norgal concluded that the jury's verdict is 100% profit disgorgement. It's 100% equitable. Well, profit disgorgement and avoided R&D is what came from the jury. That was 100% equity. Judge Norgal then ruled, consistent with Taos, that the jury verdict was in advisory. Only the judge can award equitable damages, and there were no legal damages, and Judge Norgal actually goes through in his findings and finds that the jury's verdict is 100% equitable, 100% disgorgement, and not lost profits. Okay, so you want to go back to another jury trial on that question. Your Honor, we don't think that would be appropriate. We don't think that... we think that that ship has sailed. In what sense? This is one of the most cases of trade secret theft I've ever seen, and you're saying that the remedies that were awarded... you're not defending the conduct at all here, right? We are not challenging liability. Not challenge reliability. No, Your Honor. Nor the fact of punitive damages, though you're challenging the amount, right? Correct, Your Honor. That is correct. So, if there is a problem in the remedy award, why not a new trial? We think a new trial would be appropriate on the issue of disgorgement damages, and what would be available in that trial... Why not? What about legal damages like these we've just been talking... that you've been talking about? So, the new trial would be... it is our position that the remand would be a bench trial on the issue of disgorgement damages, and that Motorola... we would not need a new jury on legal claims, because the jury did not award legal claims. What about punitives? Would that be an equitable decision for the court as well? I don't think so. I think the question... this court, and I think that's what happened in Epic Systems, was ultimately remanded to the district court. So, I think that that can be done. So, if we think there's a problem on the damages, and that a new bench trial is required for the equitable damages, what happens with the punitive damages? Is that something that the court can decide after a bench trial, or is that something that a jury would have to determine? I think the court... I think the court would decide it, and I think the court could apply Epic Systems once it became clear what the disgorgement was, because if the disgorgement... Epic Systems is based on an equitable unjust enrichment that is itself big, that then creates the 2x punitive problem. And so, if the disgorgement number was smaller, there may not be an Epic Systems problem, and I think the district court could address that. A couple of other points. Did you argue this difference between legal and equitable relief in opposing their harmlessness argument in your brief? Yes, Your Honor. Okay. Then second, I'd like you to address where you all are in terms of paying royalties and otherwise offering arguments against an injunction at this point. Your Honor, the royalties have been fully paid into the court escrow. And so, the issue that happened recently, it was in August. August? Yes, Your Honor. So, what happened is... When were you guys briefing this? I think we finished up briefing in May. So, you paid after the briefing? Yes, Your Honor. There was an event that occurred from the district court. So, Hytera moved the district court to accept shares of a subsidiary valued... It was a Canadian satellite subsidiary valued at $56 million. In lieu of cash... For which there's an open market? Well, that was the issue. Motorola didn't like that proposal. I can imagine. That stayed at issue for around a year. And so, the court ruled on it in July of this year. And then there were some subsequent... The court said, I'm going to hold a contempt proceeding because this hasn't been paid. So, you had to be threatened with contempt to pay what you were supposed to pay. And... Okay. Your Honor, the issue at the contempt proceeding is that as a result of this large $700 million in total judgment, Hytera's banks called in all of their loans and triggered provisions where Hytera's banks, which were owed $800 million at the time, had collateral rights in all of Hytera's assets. And so, what we presented to the district court is that the banks were not willing to give up those collateral assets. And, sort of, Hytera was in the middle. And Motorola was supposed to take the privately held stock as collateral. Okay. Yes, Your Honor. Ultimately, we lost that. And when we lost, the money was paid. And so, the money has been paid. Was a bond ever posted? Have you posted a bond as well, staying enforcement of the judgment? I know you hadn't. Hytera has not posted a bond. Hytera can't afford a bond. We can't get from a surety under the federal rules. Being a Chinese company, Hytera's been unable to actually get a bond for that level of judgment. Motorola did move into district court multiple times to enforce their judgment. And Judge Norgal denied that, citing the significant appeal. You all have said that, as I understand it, that in essence, the industry has moved on from this generation of pirated software and that if that's the case, how much damage would an injunction do to you? An injunction is fairly, it's almost completely moot at this point. So, Hytera has publicly announced that as of the end of the first quarter of 2025, it will no longer be selling any of the infringing products. It launched, I don't know, a year and a half or two years ago, it launched a redesigned product. Is there any dispute as to whether that incorporates, still incorporates, or is based upon the misappropriation? We don't think so, Your Honor. There's no actual current dispute. So, Motorola has not filed any litigation accusing that product of infringing. Have you gotten a cease and desist order or any communications from Motorola challenging it? No, Your Honor. No, Your Honor. What there has been is that Motorola argued to Judge Norgal that any redesign should automatically be covered by the royalty. And what Judge Norgal held is that this redesign occurred after the litigation, after the jury verdict. It wasn't part of the jury trial or decided. So, it would be a new issue for Motorola to pursue, and Motorola hasn't done that. Thank you, Mr. Clerk. We will be giving you rebuttal time. Thank you, Your Honor. Thank you. We'll now move to argument on behalf of the appellee, Mr. O'Quinn. And we're all back in our usual and customary places. Yes. I appreciate the reference, Your Honor. Thank you, Judge Brennan. May it please the court, John O'Quinn on behalf of Motorola. The district court's damages awards are supported on the facts and the law, and most of what you have heard today is a challenge to the evidentiary determinations of either the jury or the district court. And I'm happy to address any of those scattershot arguments attacking various aspects of these awards. It would be helpful if you identified the completed act of copyright infringement in the United States. So, Judge Hamilton, the completed act of copyright infringement in the United States is when a download from a server that is based in the United States is being made. A copy has to be made in memory in the computer in the United States in order for it to be able to be transferred to the receiving server. In other words, when a copy is stored on a computer, it's stored on a hard drive. It's stored in Malaysia, right? Well, so it depends on what we're talking about, Judge Hamilton. There were two systems at issue in this case. There's a clear case system in which some of the software was stored. There was a compass system which, as Mr. Shepard testified at Motorola's separate appendix, page 62, stored some of the source code, the roadmaps, guides, manuals, design documents, things such as that. That was the cached server where the original was in the United States. And yes, it is possible that a local cached copy is also created in another server. But there were 10,000, this is appendix 67, there were 10,000 technical documents that were stolen in this case. And the circumstances here, it is a reasonable inference for the jury, and this was a question for the jury to find the predicate act, reasonable inference for the jury to find at least some of them were downloaded from the United States. Given this evidence, how is that a reasonable inference as opposed to just sheer guesswork? Well, Judge Hamilton, I think it's a reasonable inference because, number one, the testimony was that the main clear case server is located in Illinois. That's at Motorola's supplemental appendix at 522. Second, the testimony was that the computer servers for the compass system, so again, there were two systems. Both of them had at least some software. The computer servers for the compass system are located in the United States. That's Motorola supplemental appendix 61. What does the evidence show was on the Illinois server but not on the Malaysian server? So, I don't know, well, Judge Hamilton, I don't know specifically what documents were not... That would be, there's a copy in Malaysia. So, Judge Hamilton, I think there are two, again, two different systems, two different setups, and the evidence with them is different. With respect to the so-called clear case system, which is where some of the source code was stored, in fact, most of the source code, that was a mirrored system, and so that is where what you have on one server is also on another server. And did the district court make that factual finding? So, the district court made factual findings at Appendix 84 and Appendix 94, and the finding at Appendix 94 was that there was a main server in Illinois and that the other servers would simply be mirrors of what is in Illinois and anything that happens on one happens on the other, which is consistent with the plea agreement, by the way, that was entered into between the government and GS Coke, where it talks about the fact that whenever you have a cached system, that if you have a download, even if it's from the cached site as opposed to the main site, that that results in communication back to the original server because you want to make sure that the document is up to date. Is there any testimony about how long that would stay on the Illinois server? Well, on the Illinois server, Judge St. Eve, it would be in perpetuity. Was there testimony to that? Because there seems to be some factual dispute as to whether or not this was just a quick back and forth or whether or not it lasted any significant duration. I understand the question that you're asking. So it's in perpetuity on the hard drive on the U.S. server. When a copy is made by downloading, and this goes to copyright infringement, not to trade secret misappropriation. When a copy is made, it would be copied into RAM, that is random access memory. I don't think there was any testimony as to how long it would be there, and there's a reason for that because that issue is entirely forfeited. That is not an issue that they raised at trial. It is not an issue that they raised in their post-trial briefing. I'd point you to R-954. That's their post-trial brief. There are two arguments that, again, these are both specific to copyright. Neither is relevant to trade secret. There are two arguments they put a lot of emphasis on on appeal that are entirely forfeited, the transitory and ephemeral argument and the argument that there was no copy made in the United States if they were downloading from a U.S. server. If we were to accept your argument that there was a download from the Chicago server, we've got the 9th and D.C. circuits saying that's not enough, right? In Superama and, what is it, I'm a pizza? I am a pizza. So would we have to create a circuit split even if we accept your factual arguments? So again, Judge Hamilton, we're just talking about copyright, not trade secret. I understand. You've got a great trade secret case. I appreciate that. But copyright's an issue here. Extraterritoriality is a tougher problem for you. I appreciate the point that you're making, and I just wanted to make sure we were all on the same page on this. So, again, I think you can sidestep this issue because this issue of whether or not a copy was downloaded in the United States and whether that copy was too ephemeral, that is, too transitory or not, was not raised in front of the jury, and whether or not there's a predicate act of copyright infringement is a jury question. That is a fact question because it goes to liability in the United States. Then the predicate act doctrine applies to decide what are the damages that flow from that. Now, if you get past their forfeiture of this argument, having not challenged the jury's verdict on appeal, having not challenged these issues in the jury's determination, then you would have the question of do you create a circuit split with I am a pizza because Superama is an unpublished decision in which, frankly, it's a very quick decision. It is not precedential, and so you wouldn't be creating a circuit split with the Ninth Circuit. The D.C. Circuit simply said that there was nothing in the case, no legal argument, no factual argument, nothing at all to suggest that a copy would have been created in the United States. We've pointed to case law, interestingly enough, both from the Ninth Circuit and the D.C. Circuit that makes clear that when a copy is made into RAM, random access memory, that that is a copy for copyright infringement purposes. Now, their counter response to that really raised for the first time in their reply brief on appeal is to say, well, that is way too ephemeral, and they cite a couple of cases that have not been cited before in this case, the CoStar case and the Cartoon Network case from the Fourth and Second Circuits. And I think it's important to recognize both of those cases involved intermediate Internet service providers, and they were really dealing with an issue of when you're not the person who's causing the download to take place, when you are not the one who is volitionally making the copy happen, is it too ephemeral to say, look, it's written into memory and it's immediately overwritten. And the evidence in Cartoon Network, unlike here, Judge St. Eve, was that it was immediately overwritten. There wasn't evidence about it being immediately overwritten. There's no reason it would need to have been immediately overwritten. And the reason there was no evidence on this is, again, they forfeited by not raising this in front of the jury or in their post-trial briefing after the jury. Mr. Quinn, you made reference to the criminal case. One defendant has pleaded. You made reference to a plea agreement. There's a variety of other defendants. There is at least one motion to dismiss the indictment in that case. Is that correct? That is correct, Judge Brennan. And then the one defendant who has pleaded is set for sentencing. But other than that, any other pending motions or just a motion to dismiss the indictment? Yeah, the only thing that I'm aware of, Judge Brennan, is the motion to dismiss the indictment. The motion to dismiss the indictment is making arguments about extraterritoriality. They are making arguments, for example, that a download from a United States server was – excuse me, that a download that would have occurred from a cached server that resulted in communication back to the U.S. server, that that would not have been enough. They're making the argument to create an act in furtherance in the United States. That's an argument that is potentially before the court. So before accepting their argument would recognize the ramifications of it. The second is – Sorry, and this is on a copyright, criminal copyright charge or trade secret charge? This is on the criminal trade secret charge. This is just with respect to trade secrets.  They are different extraterritoriality arguments. They try to make the same factual argument. They try to say, well, there wasn't a complete acquisition of the trade secret in the United States. We could talk about that, but I'm going to set it aside because under Section 1837, that is not required. Under Section 1837, all you need is an act in furtherance. And that's exactly what the Fourth Circuit held in the DeMarcerian case that came out after our brief was filed. They referenced it in footnote – I believe it's footnote 17 of their brief. And in DeMarcerian, the Fourth Circuit was confronted with the question of does the DTSA, the Defend Trade Secrets Act, apply extraterritorially. They were confronted with arguments about the presumption against extraterritoriality. The Fourth Circuit unanimously held that it did apply extraterritorially. And they were confronted with the argument that a download from a U.S. server was not enough. And the court responded to that and said, look, it doesn't matter whether or not there's been a complete act of trade secret misappropriation. All you need is an act in furtherance. And the downloading from a U.S. server certainly was an act in furtherance that took place in the United States. Mr. Quinn, on the trade secret front, I asked your colleague about your argument about harmlessness on failure to apportion and account for whatever value Hyterra might have contributed to these products. Could you address the point he was making about a legal versus equitable remedy? So the premise of his argument, Judge Hamilton, is that the jury said nothing that would support a lost profits award of $86.2 million. And I think that's mistaken. We didn't disclaim in front of the jury our request for lost profits of $86.2 million. The jury was instructed that it couldn't award duplicative awards. So, for example, it couldn't award the same award for copyright infringement and for trade secret misappropriation. And that's why it ends up being divided into two periods of time, pre-DTSA and post-DTSA, although copyright would have run the entire period. And so, you know, as this court recognized in Cosman, 211 F.3rd at 1037, when a jury returns a general verdict, the court need only find support in the record for one of the theories presented in order to affirm. Well, there's certainly substantial evidence in the record. The district court acknowledged this, supporting a lost profits award of $86.2 million. And I think that that is what the district court— Does that apply what you just read to damage findings as opposed to liability findings? So, Judge Senev, I don't see why there would be a basis for a distinction. I think they're all ultimately determinations for the jury, and one is subsumed within the other. And the fact that, you know, if, for example, if the district court had found, you know, just on remediator, for example, that the award was unsupported in the full amount, he could have certainly, you know, hypothetically remitted it to 86.2, saying, well, I don't find that this is supported, but I do find that the lost profits were supported, so it was at least 86.2. So I think the jury's award subsumes them all. Otherwise, how else is a plaintiff supposed to try their case where you have multiple damages theories being presented to the jury? And their argument is not one of legal error. Their argument is simply to say, well, factually, there should have been more apportionment. So at a minimum, you know, the lost profits is sustainable, as is the avoided costs. Isn't their argument legal to some extent, though, that they're challenging the but-for finding of the district court? So, Judge Senev, respectfully, I don't think that's a really fair reading of the district court's opinion. I mean, the district court's ultimate conclusion—  Because I didn't understand them to be challenging some of the factual premises, but on the apportionment issue, as much as legally what the district court did, that the district court said, but for causation, these infringed products wouldn't have existed, but for stealing the source code from Motorola, so we'll collect everything. And so— That legally, that was wrong. So I guess two points. First, I think they're wrong about their legal argument, and the First Circuit in Data General, this court's decision in McRoberts, I think, are to the contrary on that in terms of their legal argument. Although the First Circuit in Data General had alternative theories. Well, the First— But for—they had alternatives. They also had the apportionment theory. No, that's right. But in Data General, the court made it clear that there's a presumption both as to cause and fact and to proximate cause, both. And it's their burden to overcome as to both. And the plaintiff, quote, is entitled to argue that the defendant's infringement should be viewed as the sole or overriding cause of the defendant's profits. That's page 1176 of Data General. And in terms of what the district court here actually did, I understand they try to caricature the district court as having engaged in a but-for analysis, but I don't think that that is reconcilable with the district court's reasoning. At Appendix 82, it says, quote, there's no product that can be brought to market in this case without the benefits of the stolen research and development. And if you look at Appendix 145, the district court specifically said, quote, the products have no value as digital mobile radio products separate from Motorola's trade secrets and copyrights, end quote. I think that's much more than just applying a but-for test. But in all events, as the district court observed, this was foundational technology. As you can see in Appendix 74 to 75, it goes to the basic architecture and framework, the order of operations. So is it your argument then that apportionment wouldn't apply at all? My most modest point, Judge St. Eve, is that they did not carry their burden on apportionment. Apportionment is ultimately a fact question, and it is their burden. And what they have tried to do first in the district court, they tried to shift the burden to us. And now on appeal, they've tried to shift the burden to the district court, acting like it's just a burden of production. That is not what Section 504B says. Our only burden is to come forth with a showing of royalties. We went beyond that, and we actually did do apportionment, excuse me, of revenue. Our only burden is to show the revenue that is tied to the product. And we went beyond that and accounted for the very things that they complain about, cost of goods sold, patent royalties, sales department, asset impairment, and other such things. As you can see at Appendix 86, the district court found. And their complaint is to say, well, maybe possibly some of what was left could have been attributed to some of the features that we had as opposed to the things that actually made the system work. And my most modest point is that it is their burden to show what that would have been. They can't just say, oh, well, we did something and then put the burden onto the district court. And the fact is that they didn't put – the only thing they ever even attempted to say should have been apportioned but wasn't in any type of discernible way was R&D costs. And the district court thoroughly filleted them on their R&D costs because they were manufactured at trial. The district court at Appendix 86 found that the R&D costs were, quote, unreliable, that, quote, neither Dr. Aaron nor Mr. Wan's testimony were credible, end quote, because they had literally made it up, and you can see this at Appendix 87, that they had taken it and changed the codes to attribute more R&D expenses to the products at issue in this litigation. So I don't think you have to get to the apportionment arguments because there are alternative grounds. But if you do, it is a thoroughly factual issue, and it is one on which the district court made factual findings and in which HITERA had the burden of trying to prove some specificity of apportionment, and they didn't – they utterly failed on their burden of proof. Mr. McQueen, can I ask you to address your view at this point in December of 2023 about a need for an injunction? Judge Hamilton, I think an injunction is entirely appropriate and entirely necessary. Needless to say, the parties are not in agreement that they are no longer using the trade secrets. I think there are questions about the evidence of their so-called redesigns, and so we do not agree that there is no dispute, even if we have not yet brought one to the court's attention. I think given the conduct that they have engaged in, including, as the court observed, the fact that the only time in which they actually paid the $57 million into the escrow was when they were compelled to do so because the district court held them in contempt. And that is exactly what the Fourth Circuit, in the case called Sass v. World Programming, said is entirely when an injunction should be granted, that money damages are, quote, inadequate, when, quote, without injunctive relief incentivizing the defendant to satisfy the judgment, plaintiff's money judgment would be rendered near illusory, end quote. And in that case, the circumstance was very, very similar. An injunction was originally denied. The Fourth Circuit originally upheld the denial of the injunction, and then it took essentially a contempt order to get them to pay royalties, and the Fourth Circuit then said, yeah, an injunction is entirely right, and we would ask the same to be entered here. We're going to give Mr. Clarn six more minutes. You have six more minutes as well. Thank you, Judge Brennan. Are you in agreement that they are up to date on their royalties on paying in? I believe that is correct now with the following caveat, which is in terms of I believe they are up to date in paying what they say that they should pay based on what they are representing or products that use the copyrights or trade secrets. There may be a forthcoming dispute as to whether or not that is accurate, that is whether or not they are accurately representing that this is the sole universe of which they are using the copyright and trade secrets, but in terms of the money that the district court had specifically ordered them to originally pay, they have now paid that, and then in terms of the ongoing royalty, my understanding, and if I'm incorrect about this, we'll advise the court, my understanding is that they have paid in terms of what they have identified as originating from misappropriate, but I suspect may be a dispute about whether that is in fact all that was based on misappropriation or copyright infringement. I do want to turn back on the injunction just for two quick points. At this point, the court can decide this one of two ways. Our position was that at the time that the injunction was originally denied, it should have been granted. This court can simply reverse and say an injunction should be granted. We also then later in time filed a motion for reconsideration. The district court respectfully erroneously denied that thinking that the court didn't have jurisdiction but didn't reach the merits on it. I think between the evidence that was presented, the district court's original finding, this court can also simply reverse and order the entry of the injunction on remand, although it is certainly also open to you to simply remand and advise the district court, it's obviously now Judge Packold as opposed to Judge Norgal, that the court certainly does have jurisdiction and to suggest on whatever you might think in terms of the propriety of an injunction, but we would encourage you to simply enter an order requiring the injunction. Mr. O'Quinn, on the question of the discovery rules application, our law is clear right now, but the Supreme Court has recently granted cert in the Neely case. On the question of the discovery of parole rule in the Copyright Act, is there any reason that we should wait for that ruling before issuing our opinion? Judge Senev, I don't think you need to wait and I don't think you need to for two reasons. Reason number one is because, as you said, I think Seventh Circuit law is clear about this, and reason number two is that regardless of what the Supreme Court decides in Warner Chapel, it will still be open to apply a fraudulent concealment. In other words, even if the discovery rule does, even if the Supreme Court addresses what it means for a claim to have accrued, and that means that the discovery rule either does or doesn't apply, this is a case in which fraudulent concealment abounds. The District Court was specifically given instruction on fraudulent concealment. That was in the context of the trade secrets claim. I realize that this is now in the context of the copyright claim, but this is a case where fraudulent concealment would readily apply, and so I don't think there's a reason for you to wait. So Chicago Building Design, that 2014 case, gives us what we need on that front? Well, I think that the principal case that gives you what you need on that front is Taylor v. Merrick. I think Chicago Building Design recognized that what the Supreme Court said in Petrella might be relevant, and it was something that the parties could brief. We have briefed to you that Petrella on its own terms isn't a change in the law, and whether there will be a change in the law in the future ultimately is irrelevant. But between Taylor v. Merrick and Chicago Building Design, Judge Brennan, yes, I think you have enough to be able to affirm on that ground. Coming back to extraterritoriality, just so a couple of things are clear. Again, with respect to the trade secrets claim, the district court had two different theories for finding that there was an act in furtherance of trade secret misappropriation in the United States. Both of them are correct. One is the downloads from U.S. servers. The other is the trade shows that occurred in the United States, and that was a factual finding by the district court. They only reference it in passing at page 60 of their blue brief, and they do not show that there was any clear error in the district court's finding that that would be an appropriate act in furtherance. On the trade show question, on the trademark infringement aspect, would there have to be some link to the use in the United States with the amount of sales abroad? I don't think so, Judge St. Eve. I think it's enough that it would be an act in furtherance. It doesn't have to be a completed act. It doesn't have to be a criminal act, so I don't think that there would have to be a particular showing as to use. So any act in furtherance would be enough to open up to all extraterritorial amounts? Yes, that are related to that misappropriation, and there's no dispute that we're talking about the same technology as having been misappropriated. Again, to the extent the court has concern about that, and I don't think that you should, that is a theory that the government is relying on in opposing the motion to dismiss, and before saying that that's not sufficient, you might consider getting the government's views. The last thing that I'll say, just in passing, with respect to trade secrets, is I think you should also recognize that the avoided cost award, there's no dispute as to what that amount was, that avoided cost award is not subject to extraterritoriality. Those are the avoided costs for them to be able to make any of these products and to make any of these sales, including sales in the United States. Thank you, Mr. O'Quinn. Thank you, Judge Brennan. Again, if the court has no further questions, other than with respect to the injunction, we ask that the court affirm. Thank you. Thank you. Mr. Clern, rebuttal, we're going to grant you six minutes. Thank you, Your Honors. So quickly on the copyright issue, there is no evidence, even if files were downloaded from a U.S. server, there's no evidence what happens on that U.S. server. There's no evidence that any copy is made. And on page 48 of Motorola's brief, they actually argue, but it's pure attorney argument, there's no site. They say, as part of downloading a file from a server, a duplicate version of that file is created in memory for transmission across the Internet. No site. And the reason there's no site is because there's no evidence. And Motorola says that's high terrorist problem, that there's no evidence. But that's not true. Guerrero, Seventh Circuit clear law, says that extraterritoriality must be established by the plaintiff. It's a plaintiff's burden, just like any other element in the case. That's Guerrero, Seventh Circuit. So it is Motorola's burden. Motorola has to show a predicate act in the United States. And this is completely on all fours with I'm a pizza, because that's exactly what happened there. And I'm a pizza, the plaintiff didn't have any evidence of what happened when someone from outside the United States downloaded something from a server inside the United States. And I'm a pizza said, so you haven't met your burden to show a predicate act. Do you want to address the trade show question? Yes, Your Honor, absolutely. So on page 52 of Motorola's brief, Motorola argues that there has to be a link. What they say on page 52, quote, that domestic promotion trade show resulted in extraterritorial sales and qualifies as an act in furtherance of those sales. They also later down the page say high terrorist promotion at U.S. trade shows, therefore enabled its extraterritorial sales. No site on either one of those sentences. Again, pure attorney argument. There does have to be a link. It has to be an act in furtherance. Unlike the predicate act, it doesn't have to be a completed copyright infringement or a completed misappropriation in the United States. But there does have to be an act in furtherance. Motorola agreed with that when they wrote their brief. There's causality that's required there, right? We still have to have causation. We're all in the context here of the presumption against extraterritorial application of laws. And if 1837 applies, which it doesn't, but if 1837 does apply, then it applies in that limited way. There's got to be an act in furtherance. There's got to be proof sale by sale of the link. What we've got here is theft of secrets essential to the whole product everywhere it's sold, right? So first of all, Your Honor, HITERA provided in Record 1096-1, that is HITERA's proposed findings of facts and conclusions of law, HITERA provided there all of the factors, tons of factors that drive profits other than the infringement. So I just want to make sure that that's in the record. That was timely provided to Judge Norgel. He didn't address them. I'm not sure that actually answers my question. That goes to apportionment. It does go to apportionment. Your Honor mentioned the infringement relating to the whole product. And so we do dispute that, and we provided those facts to Judge Norgel. In terms of causation, however, the stolen secrets were essential to all of those products your client was selling that were subject to the trial, correct? All of the products that are the subject of the foreign sales disgorged contained copied Motorola code. That is correct. I'll accept that. Okay. Still, so your Honor asked, does there need to be sale-by-sale causation? We would not go that far. So let me give you a hypothetical. Let's say that there's a business and somebody says, we sure have a lot of people going off to these boondoggle trade shows, and we're spending a bunch of money on this. Let's do an analysis and see if it's actually getting us anything. And so somebody looks, they call some customers, they do a memo, and in the memo it says, we actually get 10% of our sales from attending these trade shows. That's worth doing. Let's spend the money, right? That evidence doesn't exist here. There is no evidence of any link at all to any single sale, much less all sales. There were 2 million unit sales in the disgorgement period from 2010 to 2019. 80% of those were outside the United States. The notion that attending a couple of trade shows was an act in furtherance of all of whatever, 1.67 million foreign unit sales, that's not a fair inference at all. They mention the criminal plea. It is the government's contention in the criminal case that when someone accesses a Compass server that there's some kind of interaction from a Penang Compass server to an Illinois Compass server. There's no evidence for that. It's not proven. GS Koch put in his plea what he needs to put in his plea to make the government happy. He's lied under oath, and there should be no reason that anyone should take evidence outside of this case that's unsupported and bring it into this one. Mr. O'Quinn suggested we ask the government for its views on extraterritoriality under the DTSA. What do you think about that? The government is dealing with the Economic Espionage Act. The court's free to ask the government for its views, but there are two different statutes. One's the DTSA, one's the EEA. You may finish up. Go ahead. 1837 does not apply to the DTSA. To get right to the heart of the matter, it's the Kellogg-Brown case. The Kellogg-Brown case was decided by the Supreme Court one year before the DTSA was passed. And there the Supreme Court was looking at Title 18, and that's where both the EEA and DTSA are. And they said the word offense in Title 18 means only criminal, only criminal, not civil. That was the issue in that case under the wartime Statute of Limitations Act. And so this was decided. Congress is deemed to legislate with that in mind. And so it's got to be— This is all addressed in your briefs, and we're hearing it now today for the first time at the end of your rebuttal. Okay. Thank you, Mr. Clarnon. Thank you for your team. Thank you, Mr. O'Quinn. And for your team, the case is going to be taken under advisement.